UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JEANETTE BEEKER, CHARLES LEWIS,
HENRY LEWIS, and CINDY BALIKO,

                  Case No. 05-10089-BC

        Plaintiffs,        Honorable David M. Lawson

v.

JANET OLSZEWSKI and MARIANNE UDOW,

        Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT, ENJOINING DEFENDANTS FROM ENFORCING PROVISION OF STATE MEDICAID PLAN, AND DENYING MOTION TO CERTIFY CLASS

The plaintiffs in this case challenge the policy and practice of the State of Michigan of allowing pharmacists to refuse to fill prescriptions for Medicaid recipients who are unable to pay co-payments and have delinquent balances for unpaid co-payments from past prescriptions. They also contend that the State has failed to provide Medicaid recipients with required information about their right to receive services when they cannot pay. The case is before the Court on cross motions for summary judgment filed by the parties. The Court heard oral arguments on the motions on January 22, 2006. The Court now finds that the State's policy violates federal law presently in effect. The Court expresses no view of the impact of the recently-enacted Deficit Reduction Act of 2005. The Court will enjoin the State from authorizing and notifying pharmacists to engage in such practices. However, the plaintiffs also seek an order preventing the State from charging any co-payments to Medicaid recipients until it provides the required information regarding the right to receive services when a recipient cannot pay. The defendants seek a dismissal of the count of the

complaint asking for such relief.  The Court finds that no such relief can be ordered.  The Court, therefore, will grant in part and deny in part each party's motion for summary judgment.

I.

The plaintiffs are current Medicaid recipients who live in Michigan.  The defendants are Janet Olszewski and Marianne Udow, directors of the Michigan Department of Community Health (DCH) and Department of Human Services (DHS) respectively.  Ms. Olszewski is responsible for administering the Michigan Medicaid program.  Ms. Udow is responsible for providing information about the Medicaid program to applicants and recipients.  They are being sued in their official capacities under section 1983.

The named plaintiffs are all taking several medications for serious conditions such as bipolar disorder, seizures, asthma, HIV, meningitis, and schizophrenia.  The parties disagree about the services Medicaid providers are required to provide to Medicaid patients who cannot afford to pay authorized co-payments for their prescriptions and the information the state Medicaid agency is required to provide to Medicaid recipients and applicants.

Federal law currently in effect states:

> The State plan shall require that no provider participating under the State plan may deny care or services to an individual eligible for such care or services under the plan on account of such individual's inability to pay a deduction, cost sharing, or similar charge. The requirements of this subsection shall not extinguish the liability of the individual to whom the care or services were furnished for payment of the deduction, cost sharing, or similar charge.

42 U.S.C. § 1396o(e).  The plaintiffs contend that this provision means Medicaid providers may not refuse to fill prescriptions when a recipient cannot pay, and providers may not refuse services as a self-help means of collecting past co-payments the recipient could not afford.  The defendants, however, interpret the provision to mean that providers may refuse to fill prescriptions when a

-2-

recipient cannot pay if that recipient has "bad debt," that is, unpaid co-payments from previously-filled prescriptions. The defendants have amended the state Medicaid plan to reflect their interpretation of federal law and have advised Medicaid providers that they may refuse to provide services in such situations.

In July 2004, DCH amended the state Medicaid plan to add the following section, entitled "Free Choice of Provider":

> [T]he Medicaid agency assures that an individual eligible under the plan may obtain Medicaid services from any institution, agency, pharmacy, person or organization that is qualified to perform the services, including an organization that provides these services or arranges for their availability on a prepayment basis. Providers who elect not to provide services based on a history of bad debt, including unpaid co-payments, shall give beneficiaries appropriate verbal notice and a reasonable opportunity for payment.

Compl., Ex. B. In addition, the state Medicaid Provider Manual states in several places that:

> Providers may not refuse to render service if a beneficiary is unable to pay the co-payment amount at the time the service is provided. However, the uncollected co-payment is considered a bad debt which allows the provider to refuse to provide future services according to Michigan's State Plan. Providers who elect not to provide services based on a history of bad debt, including unpaid co-payments, must give beneficiaries appropriate verbal notice and a reasonable opportunity for payment.

Compl., Ex. E.

The plaintiffs also believe the defendants have failed to comply with federal laws requiring state agencies to provide certain information to Medicaid patients. A federal regulation states as follows:

> Availability of program information.
> (a) The agency must furnish the following information in written form, and orally as appropriate, to all applicants and to all other individuals who request it:
> (1) The eligibility requirements.
> (2) Available Medicaid services.
> (3) The rights and responsibilities of applicants and recipients.

> (b) The agency must publish in quantity and make available bulletins or pamphlets that explain the rules governing eligibility and appeals in simple and understandable terms.

42 C.F.R. § 435.905.  The pamphlets and booklets available for Medicaid recipients do not tell recipients that they can obtain prescriptions even when they are unable to make the co-payments. One pamphlet, publication 201, tells recipients that they "have the right to know if a co-payment is required," but it does not explain how to go about obtaining that information.  Compl., Ex. Q. Another pamphlet, publication 1111-15, tells recipients, "You may have a co-payment for some services.  Your provider will tell you when you must pay the co-payment."  Compl., Ex. R.

The plaintiffs contend that none of them were ever informed of their rights and responsibilities with regard to Medicaid co-payments until they contacted the Center for Civil Justice.  They were given various pamphlets by the state agency, none of which explains a Medicaid recipient's rights when he or she is unable to make a co-payment.

The defendants argue that the plaintiffs do not have standing to advance their claims. Therefore, it is necessary to set forth in some detail the allegations the named plaintiffs have stated concerning the difficulties the plaintiffs have encountered  in obtaining their medications.

According to the complaint, in February 2005, Jeanette Beeker learned from the Center for Civil Justice that providers may not deny her services because of her inability to make co-payments. She says she was never informed of this by DHS or DCH.  Prior to that, Ms. Beeker did not attempt to get her prescriptions filled when she could not make the co-payments.  The complaint states that in February 2005, a pharmacist at Kroger filled a prescription for Ms. Beeker when she could not make the co-payment.  The complaint alleges that the Kroger pharmacist told Beeker that he would not fill future prescriptions unless she could make the co-payment.  Since then, Beeker has always

been able to make the required co-payments, but she has not managed to pay off the "bad debt" from the co-payment she was unable to make.  She contends that she fears that she may be denied services if she is ever unable to make the payment in the future.   However, at the time the complaint was filed, Beeker had never been denied services based on "bad debt" from unpaid co-payments, although she had been threatened with such denial.  The plaintiffs' allege in their motion for summary judgment Beeker has since been denied pharmacy services due to unpaid bad debt, and Beeker so testified at her deposition.  Beeker testified that she was told she could avoid the co-pay one time only.

In late 2004, Charles Lewis learned from the Center for Civil Justice that providers must fill his prescriptions even if he cannot make the co-payment.  He says he was not aware of this previously because neither DHS nor DCH had ever notified him about his rights.  In December 2004, Charles Lewis was hospitalized.   After being released, he attempted to fill several prescriptions at Hurley Medical Center but could not make the co-payments.  Hurley Medical Center refused to fill the prescriptions.  Charles Lewis then went to Rite-Aid, which also refused to fill his prescription because he could not make the co-payments.  The next day, Charles Lewis dropped off his prescriptions at Walgreens, where the pharmacist agreed to fill them even though he could not make the co-payments.  When he returned to pick up the medication, a different person was on duty and would not give Charles Lewis his prescription unless he paid.  He eventually received the prescriptions when the pharmacist agreed to pay the co-pay out of his own pocket.  Charles Lewis was told that Walgreens would not fill prescriptions for him in the future unless he could pay the co-payment himself.

In January 2005, Charles Lewis was hospitalized again.  When he was released, a case manager from Wellness Networks, a nonprofit organization, arranged for Diplomat pharmacy to fill Charles Lewis' prescription even though he could not make the co-payment.  The pharmacist at Diplomat told Charles Lewis that he would not fill future prescriptions if Charles Lewis could not make the co-payment, and that they only fill prescriptions without a co-payment on a "one time only" basis.  Charles Lewis is concerned that he may be denied service in the future.  He has never been denied services based on bad debt from unpaid co-payments.

Henry Lewis (Charles' cousin) is another named plaintiff.  He is legally blind.  According to the complaint, Henry Lewis did not become a Medicaid recipient until March 2005; his eligibility was made retroactive to November 1, 2004.  The complaint alleges that in late 2004, Henry Lewis was informed by a case manager at Wellness Networks that the law required providers to fill his prescriptions even if he could not make the co-payment.  He had never been made aware of this from DHS or DCH.  Henry Lewis was hospitalized in December 2004.  When he was released, he went to Rite-Aid to have his prescriptions filled.  He was denied service because he could not make the co-payment.  He went back to Rite-Aid later, and the pharmacist agreed to fill his prescription based on his participation in the Michigan Drug Assistance Program (MDAP).  When Henry Lewis returned to Rite-Aid to pick up his prescription, the pharmacy refused to give him the medications unless he made the Medicaid co-payments.  They also refused to return his MDAP card to him. Henry Lewis borrowed some money and was able to obtain three of his eight prescriptions.  Henry Lewis went to Diplomat pharmacy and attempted to have the other five prescriptions filled even though he could not make the co-payment.  Diplomat refused to fill the prescriptions.  Henry Lewis went without medication for several weeks.  During that time, he took some of Charles Lewis'

medication.  Henry Lewis has never been denied service due to "bad debt" from unpaid co-payments.

In late March 2005, Cindy Baliko went to the Clio Road Pharmacy to have several prescriptions refilled.  The pharmacy refused to fill the prescriptions because Baliko could not make the co-payments.  Baliko contacted the Center for Civil Justice and was told that the providers cannot refuse service based on inability to make the co-payment.  Baliko had never been told this by DHS or DCH.  Before learning this, Baliko simply did not get her prescriptions filled when she did not have any money.  Baliko returned to Clio Road Pharmacy and told the employees what she learned.  Clio Road Pharmacy agreed to fill Baliko's prescription but said she would have to pay the co-payments due before they would fill any future prescriptions for her.  When Baliko picked up the prescriptions, the pharmacy failed to give her three of the prescriptions.  When Baliko returned to retrieve the other prescriptions, the pharmacy would not release them until she paid the co-payments for the prescriptions she had been given earlier, even though she had already told them she had no money.

Based on the allegations in the complaint, Ms. Baliko appears to be the only named plaintiff who had been denied services based on bad debt from previously unpaid co-payments at the time of the complaint.  Her interrogatory responses, however, call this into question.  She was asked to list each interaction with a pharmacy, whether she obtained her prescriptions, whether she had bad debt at that time, and the source of that bad debt. She answered that on March 24, 2005, she dropped off prescriptions at Clio Pharmacy.  To the question of whether she obtained the prescriptions, Ms. Baliko wrote "Yes, eventually."  She also wrote that she "may have owed some co-payments" at that time.  She again dropped off prescriptions on March 30, 2005, which she also received "eventually."

Defs.' Mot. to Dism., Ex. 9, Baliko Ans. to Interrog. No. 1.   The interrogatory answer states that presently Ms. Baliko had no bad debt.   However, it also states that Ms. Baliko was refused prescriptions at Clio Pharmacy in May 2005 because she was unable to pay the co-payment.   Robert Rossow, owner of Clio Pharmacy, stated in his deposition that Ms. Baliko has unpaid co-payments, she was told she would be denied services in the future unless she paid them, and she transferred her prescriptions to another pharmacy based on that information she received from Mr. Rossow's pharmacy.   In addition, Ms. Baliko answered an interrogatory that she was given a prescription at Rite-Aid in May 2005 even though she could not make the co-payment.   However, the pharmacist told her that she would not be given any prescriptions in the future unless she could make the co-payment.

In April 2005, Ms. Baliko again attempted to have prescriptions filled at Clio Pharmacy.   The pharmacy filled the prescriptions but refused to release them until she paid the co-payments.   Baliko was unable to pay, she says, and the pharmacy refused to provide her with the prescriptions.   Baliko contacted K-Mart pharmacy to ask if they would fill her prescriptions without the co-payment.   She was told no.   On April 15, 2005, Baliko's mother allowed Clio Road Pharmacy to charge the co-payments to her credit card.   The pharmacy then released the prescriptions it refused to provide from March and April.

On April 22, 2005, Baliko attempted to have K-Mart fill another prescription without making the co-payment.   K-Mart pharmacy refused to fill the prescription until a lawyer for the Center for Civil Justice contacted the pharmacist.   K-Mart then filled the prescription, but Ms. Baliko was told that service would not be provided to her in the future if she could not pay, and that provision of services without the co-payment was a "one-time only" arrangement.   Compl. ¶ 260-261.   Baliko

-8-

testified at her deposition that since the complaint was filed, she has been denied services when she could not make co-payments due to "bad debt," and she has used nearly every pharmacy available to her.

The parties have deposed several pharmacy owners or managers. Philip R. Hagerman, president of Diplomat pharmacy, testified that his pharmacy's general policy is to fill prescriptions even when clients cannot make the co-payments. However, he understands that the law allows pharmacies to refuse services to Medicaid recipients who have unpaid co-payment debt. He deals with each client "on a case by case basis." Defs.' Mot. Dismiss, Ex. 25 at 10. Diplomat does not have an organized collection procedure. When a client comes in who has several unpaid co-payments, the pharmacist "would enjoin the decision making process whether we would be able to fill that prescription." *Id.* at 28. An individual pharmacist would need to consult with someone else to determine whether the prescription would be filled. For example, Charles Lewis has been given prescriptions at Diplomat when he could not make the co-payment. Hagerman stated that, based on Charles Lewis' unpaid co-payment debt of $29, the pharmacy staff would have to consult with someone before giving out another prescription without the co-payment.

Amy L. Yadmark, pharmacy supervisor for Walgreens, testified that each pharmacy under her supervision is permitted to decide what efforts it will take to collect unpaid co-payments. One option available to the pharmacists is to give the client the prescription without requiring payment. Another is for the pharmacist to dispense three to five days worth of the medicine to the client to give them time to come up with the co-payment. Pharmacists at Walgreens are permitted to tell clients that they might be denied services in the future if they are unable to make their co-payments.

However, Yadmark stated only two of the ten stores she supervises keep track of bad debt from co-payments, and those two stores only keep the records in a paper notebook.

Robert T. Rossow is the owner and pharmacist of Clio Pharmacy where Ms. Baliko has claimed to have been denied services. Rossow stated his pharmacy will fill prescriptions for people unable to make their co-payments, but he tells the clients they are expected to repay the bad debt the next time they visit the store. They do not make efforts to collect the debt except to ask the person the next time they visit for the co-pay debt. A client with unpaid co-payments from the past will only have the current prescriptions filled if they can pay for the current prescriptions. If a person had unpaid co-pay debt and could not pay the old debt or for the new prescription, Mr. Rossow's pharmacy "probably wouldn't fill your prescriptions." Defs.' Mot. Dism., Ex. 27 at 15. Nonetheless, Rossow testified that his pharmacy has filled a prescription for Ms. Baliko without requiring the co-payment on one occasion, although she was "told she had to repay us for those co-pays before we fill prescriptions for her again." Defs.' Mot. Dis., Ex. 27 at 21:6-8. Rossow admitted that because of the warning, Ms. Baliko had her prescriptions transferred to another pharmacy.

The plaintiffs filed a two-count complaint. Count one alleges that the State's Medicaid policy implemented by defendant Olszewski violates 42 U.S.C. §§ 1396a, 1396o and 42 C.F.R. §§ 447.15, 447.53 by denying poor recipients access to Medicaid services due to their inability to make co-payments. Count two alleges the defendants violate 42 C.F.R. § 435.905 by failing to ensure that the plaintiffs and others similarly situated receive proper information about the co-payments they may be required to pay and their rights when they cannot pay. They ask that the Court declare the state policy illegal under federal law and enjoin the defendants from implementing the state co-

payment policy.  They also want the state to be enjoined from charging any co-payments to

Medicaid recipients until they provide the required information regarding the right to receive

services when a recipient cannot pay.  The defendants state that the plaintiffs have not been injured

by state action, although the defendants acknowledge that individual pharmacies may have violated

federal and state law.  Both sides have filed motions for summary judgment.

## II.

As an initial matter, the defendants argue that the plaintiffs do not have standing to bring this

action.  As this Court has noted in Medicaid actions in the past:

> Federal courts are empowered to adjudicate only "cases" and "controversies."  U.S.
> Const. art. III, § 2.  This limitation is commonly enforced through the doctrine of
> standing, which requires that plaintiffs have a "concrete private interest in the
> outcome of the suit."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992).  To
> possess standing, a plaintiff seeking an injunction must show that (1) she has
> suffered an "injury-in-fact" that is concrete, particularized, and actual or imminent;
> (2) the injury is fairly traceable to the conduct of the defendants; and (3) the
> requested relief would likely redress the injury suffered.  *Friends of the Earth, Inc.
> v. Laidlaw Env. Servs.*, 528 U.S. 167, 180-181 (2000); *National Rifle Assoc. of
> America v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997).  The denial of Medicaid
> benefits to which an applicant would otherwise be entitled is a cognizable injury for
> standing purposes.  *Hazard v. Shalala*, 44 F.3d 399, 403 (6th Cir.1995).

*Markva v. Haveman*, 168 F. Supp. 2d 695, 704 (E.D. Mich. 2001), *aff'd* 317 F.3d 547 (6th Cir.

2003); *see also McConnell v. Fed. Elections Comm'n*, 540 U.S. 93, 225-26 (2003) (reiterating that

"the irreducible constitutional minimum of standing" consists of "an injury in fact, which is

concrete, distinct and palpable, and actual or imminent," "a causal connection between the injury

and the conduct complained of – the injury has to be fairly traceable to the challenged action of the

defendant, and not the result of some third party not before the court," and a "substantial likelihood

that the requested relief will remedy the alleged injury in fact") (internal quotes and citations

omitted).

In *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973), the Supreme Court rejected the notion that the injury must be significant or substantial. Rather, "[a] plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action."  *Id.* at 688.  The Court noted:

> We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, see *Baker v. Carr*, 369 U.S. 186; a $5 fine and costs, see *McGowan v. Maryland*, 366 U.S. 420; and a $1.50 poll tax, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663. . . .  As Professor Davis has put it: 'The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613. See also K. Davis, *Administrative Law Treatise* §§ 22.09--5, 22.09--6 (Supp. 1970).

*Id.* at 690, n.14.  In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court explained that such an injury, if it had not already occurred, must be "imminent," that is, likely to occur immediately.

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is "*certainly* impending," . . . . It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control.  In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

*Id.* at 564, n.2 (citations omitted).  As examples of cases in which there was no immediate injury, the Court cited *Whitmore v. Arkansas,* 495 U.S. 149 (1990), and *Los Angeles v. Lyons,* 461 U.S. 95 (1983).  *Whitmore* involved a prisoner who was trying to appeal the death sentence of another prisoner.  The Court held that he had no standing.  In *Lyons*, the plaintiff alleged that the police put him in a choke hold when they arrested him.  He sued for damages and also sought an injunction to

-12-

prevent the city police from using the choke hold unless absolutely necessary. The Supreme Court held that the plaintiff had no standing to obtain injunctive relief unless he intended to be arrested again, something they were not willing to assume.

The defendants contend that the plaintiffs do not have standing to challenge the "bad debt" policy because they have not alleged an injury that is attributable to the State. The defendants offer three reasons in support of their argument. First, the defendants state the plaintiffs have not been injured at all because denial of services by one pharmacy does not constitute injury, and the plaintiffs often received their prescriptions at another pharmacy after first being denied by one pharmacy. Second, even if the plaintiffs were injured, the defendants state the injury was not caused by state action, but rather by renegade pharmacists who violate state law. Third, the defendants state that the plaintiffs cannot show they are in imminent danger of injury because they would have the money to make their co-payments if they only managed their finances better, such as discontinuing cable television, moving in together, and ordering their prescriptions in 100-day supplies, which have the same co-payment amounts as thirty-day supplies.

Except as to one of the named plaintiffs, these arguments are unpersuasive. The Court finds that Ms. Baliko, Ms. Beeker, and Charles Lewis all have standing to challenge the state policy regarding co-payments. Ms. Baliko and Ms. Beeker have both alleged that they were denied services based on unpaid co-pay debt, giving them the actual injury required for standing. Charles Lewis has been threatened with such denials, alleging sufficient injury. Henry Lewis does not have standing because he has not been actually injured and it does not appear that injury is imminent.

In support of their first argument that the plaintiffs have not been injured if they have been denied services by only one pharmacy, the defendants cite *Lacy v. Cohen*, 596 F. Supp. 1010, 1017

-13-

(E.D. Pa. 1984). However, that case does not support the proposition for which it is cited. In *Lacy*, the district court denied the plaintiffs a preliminary injunction because they could not show irreparable harm. The plaintiffs in that case sought to enjoin the enforcement of a Medicaid co-payment system until proper notice could be given to Medicaid recipients. The plaintiffs did not claim that the co-payment system itself was illegal. The court denied the plaintiffs' motion for an injunction, holding that they could not demonstrate irreparable harm:

> In short, issuance of a preliminary injunction is not warranted on the ground that plaintiffs are in jeopardy of deprivation of needed medical care. Pennsylvania's system of copayment requires providers to provide treatment to those unable to pay. Plaintiffs have not established that providers are refusing – or that they are likely to refuse – care, in violation of that regulation.

*Id.* at 1020. Although the legitimacy of the co-payment program itself was not at issue, the judge in that case did discuss the co-payment program:

> Recipients confronted with a provider's refusal to furnish services because the recipient cannot make the copayment have at least two remedies: (1) The recipient can contact the local County Assistance Office for assistance in resolving a dispute, or (2) the recipient can seek needed care from other providers willing to abide by the regulation. Testimony at the hearing on plaintiffs' motion established that, at least with respect to witnesses who testified, the latter recourse was viable because sufficient providers existed in their neighborhoods.

*Id.* at 1017.

In this case, the regulation ordained by the State permits pharmacists to refuse services because of past-due co-payments. The defendants' argument that a Medicaid recipient may avoid the impact of the State's policy by a peripatetic search of pharmacies in the region each time a prescription must be filled or renewed, all the while avoiding those establishments previously visited when co-payments could not be made, is untenable. Switching providers time after time amounts to an injury sufficient to establish standing because that practice disrupts relationships and continuity

-14-

of care.  In addition, federal law limits the number of times certain prescriptions can be transferred from one pharmacy to another.  *See* 21 C.F.R. §1306.25(a).

The defendants' second argument is that the plaintiffs' injury is not caused by state action, but rather by renegade pharmacists who are violating state law.  However, the focus of the complaint is the State's policy authorizing Medicaid providers to deny "services based on a history of bad debt, including unpaid co-payments."  Compl. ¶ 100.   The challenged conduct is attributable to the defendants, who are State officials sued in their official capacity.  The defendants contend that it was the pharmacies that failed to give "appropriate verbal notice and a reasonable opportunity for payment" as required by state law.  But the defendants have failed to explain to pharmacies, the plaintiffs, or the Court what qualifies as appropriate notice and opportunity to pay.  The defendants have instead stated that "it is the intent of the policy that providers follow their usual customary business practices as they would use with any customer or patient having a history of bad debt." Pls.' Resp. To Defs.' Mot., Ex. 1.  This policy allows pharmacies to give whatever notice they choose.  Ms. Baliko, Ms. Beeker, and Charles Lewis have all been told they would be refused future services if they did not repay their co-pay debts.  Compl. ¶ 174, 193, 199, 244, 261.  Those injuries can be traceable to the State regulation under attack in this case, and it is sensible to conclude that pharmacies will follow a practice of denying services as a self-help method of collecting past-due co-payments if the State policy allows it.

The defendants' final argument regarding standing is that the plaintiffs cannot show they are in imminent danger because they would have the money to make their co-payments if only they managed their finances better.  The defendants assert that the plaintiffs should be able to afford their co-payments.  But Ms. Beeker and Ms. Baliko's incomes are each less than $8,000 per year.  Charles

-15-

Lewis' income is around $10,000. The defendants have not explained how one might provide for food, shelter, heat, medical care, and the other necessities of life with such incomes in an economy of rapidly rising fuel prices and medical costs, which have a disproportionate impact on the poor. Moreover, the plaintiffs have no control over the number of doses their doctors authorize when writing their prescriptions. The Court is not persuaded by the argument there is no standing because these plaintiffs are likely to be able to afford their co-payments in the future.

Ms. Beeker has alleged sufficient actual injury to have standing. She testified at a deposition that she was denied services at a Kroger pharmacy on July 26, 2005 because she had unpaid "bad debt" and was unable to pay the co-payment for the prescriptions she was attempting to fill. She was then required to drive across town to find another provider that would fill her prescription without requiring her to pay the co-payment. The time and expense of finding another provider to fill her prescription constitutes sufficient injury, especially given the price of gasoline, which at the time averaged $2.31 per gallon, then a record high. *Gas Prices Don't Deter Vacationers*, CBS News, July 11, 2005, *available at* http://www.cbsnews.com/stories/2005/07/11/national/main707975.shtml (last visited Feb. 13, 2006) (on file with the Court). Additional injury is imminent. The pharmacy that filled Ms. Beeker's prescription without requiring her to make the co-payment is now authorized under the challenged policy to deny services to Beeker the next time she cannot make the co-payment. Because of Beeker's precarious financial position, the Court believes refusal of services is likely to happen. Ms. Beeker's annual income is less than $7,400. If Ms. Beeker is denied services in the future, she may not be able to get to or find a pharmacy to fill her prescriptions. When this case was filed, Beeker was taking nine prescriptions for high cholesterol, heart problems, hypertension, bipolar disorder, arthritis, and eye problems. Failure to take that medication could

have a serious medical impact on her. Ms. Beeker's injury is caused by the defendants' authorization of such a policy for Medicaid providers, and the relief requested would remedy the injury.

Ms. Baliko has also alleged sufficient injury to have standing. Baliko alleged in her complaint that she was denied service at Clio Road Pharmacy in late March 2005 due to unpaid co-pays from previously provided prescriptions. Compl. ¶ 240-250. Baliko went without the medications until about April 15, 2005, when her mother paid for the prescriptions she needed. Going without her prescribed medication for over two weeks constitutes sufficient injury. Additional injury is imminent. Ms. Beeker has still not paid off the unpaid co-payments she owes Clio Pharmacy, and therefore the pharmacy can deny her services again if she is unable to make the co-payment. Because of Ms. Baliko's precarious financial position, this is extremely likely to happen. Baliko's annual income is less than $7,200. If Baliko is denied services in the future, she may not be able to get to or find a pharmacy to fill her prescriptions. When this case was filed, Baliko was taking twenty-two prescriptions for schizophrenia, bladder/interstitial cystitis, acid reflux, sleep and nerve problems, hypertension, swelling, back pain, seizures, depression, and for the effects of her hysterectomy. Failure to take her medication could have a serious medical impact on her. Ms. Baliko's injury is caused by the defendants' authorization of such a policy for Medicaid providers, and the relief requested would remedy the injury.

Charles Lewis has alleged sufficient imminent injury to have standing. He alleged that the Walgreens Pharmacy refused to fill his prescription because he could not make the co-payment in December 2004. The pharmacist paid the co-payment for him, and Charles Lewis was told that Walgreens would not fill prescriptions for him in the future if he could not make the co-payment.

-17-

Compl. ¶ 193.  The same thing happened to him in January 2005 at Diplomat Pharmacy.  Diplomat filled Charles Lewis's prescription even though he could not make the co-payment, but he was told that Diplomat would not fill future prescriptions if Charles Lewis could not make the co-payment. Compl. ¶ 200.  Because of his precarious financial situation, Charles Lewis likely will be unable to make co-payments in the future.  His annual income is just over $10,000.  When this case was filed, Charles Lewis was taking fourteen prescriptions for seizures, hypertension, asthma, back pain, and HIV.  Failure to take his medication could have a serious medical impact on Charles Lewis.  The imminent injury would be caused by the defendants' authorization of such a policy for Medicaid providers, and the relief requested would remedy the injury.

Henry Lewis does not have standing, however.  He has alleged that he was denied service when he could not make a co-payment, but because he did not have "bad debt" at that time the denial cannot be attributed to the state.  He has also never been threatened with denial due to unpaid bad debt.  Compl. ¶ 202-224.  The defendants state Henry Lewis "is currently enrolled in a Medicaid Health Plan whose protocol does not include charging its members co-payments.  Moreover, the record establishes that he gets all of his prescription medications delivered to him by Diplomat [Pharmacy], and that the records of this provider, whose generous policy towards Medicaid recipients was lauded by his own counsel, indicate that he has no co-payment debt."  Defs.' Mot. Dism. at 17.  Although the defendants do not cite to anything in the record to support this claim, the plaintiffs do not contest it.  Although Diplomat Pharmacy is authorized under the State policy to charge Henry Lewis for the prescriptions it delivers and to refrain from serving him if he does not pay the debt, there is no evidence that the provider's change in policy is likely to occur because Henry Lewis's plan protocol does not call for co-payments.

-18-

Plaintiff Henry Lewis will be dismissed from the action. The Court finds that the other plaintiffs have standing to sue.

### III.

Both parties have moved for summary judgment. A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. It is "appropriate [when] 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 565 (6th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). The main issue in this case centers on the meaning of a provision of the Medicaid statute, 42 U.S.C. § 1396o(e). Summary judgment under Rule 56 is a useful method of addressing an issue when the parties agree, as here, that there are no material facts in dispute and "the sole question at issue [is] a question of law." *United States v. Donovan*, 348 F.3d 509, 511 (6th Cir. 2003); *see also Wachovia Bank v. Watters*, 431 F.3d 556, 559 (6th Cir. 2005); *Progressive Corp. and Subsidiaries v. United States*, 970 F.2d 188, 190-91 (6th Cir. 1992).

### A.

The plaintiffs have brought their complaint under 42 U.S.C. § 1983, under which they must plead and prove: (1) that the defendants acted "under color of law" and (2) that defendants' conduct deprived the plaintiffs of a right, privilege or immunity secured by the Constitution or the laws of the United States. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 501, 508 (1990); *Parratt v. Taylor,* 451 U.S. 527, 535 (1981). The parties do not dispute the first element. The defendants are the heads of

State agencies, and they are responsible for managing the administration of Medicaid policies at the State level in accordance with federal law.

The defendants contend that the plaintiffs cannot establish the second element because the federal law upon which they rely, 42 U.S.C. § 1396o(e) and its implementing regulations, does not create a privately enforceable right. Such claims frequently arise in the context of legislation enacted pursuant to Congress' spending authority. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 279-82 (2002). However, the Supreme Court and the Sixth Circuit Court of Appeals have held on more than one occasion that certain provisions of the Medicaid statute can be enforced by its intended beneficiaries by actions brought pursuant to section 1983. *Wilder*, 496 U.S. at 508; *Westside Mothers v. Haveman*, 289 F.3d 852, 863 (6th Cir. 2002); *Barton v. Summers*, 293 F.3d 944, 953 (6th Cir. 2002); *Markva*, 317 F.3d at 553-54.

In *Wilder*, the Supreme Court held that the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), created rights privately enforceable under section 1983 against state agencies. The Court recognized only two exceptions in which statutory rights are not actionable:

> A plaintiff alleging a violation of a federal statute will be permitted to sue under Section 1983 unless (1) "the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself."

496 U.S. at 508 (quoting *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 423 (1987)). The Court established a three-part test to determine whether the first exception exists, i.e., whether the statute creates private rights, requiring answers to the following questions: (1) Was the provision in question intended to benefit the plaintiff? (2) Does the statutory provision in question create binding obligations on the defendant governmental unit, rather than merely

-20-

expressing a Congressional preference? (3)Is the interest the plaintiff asserts specific enough to be enforced judicially, rather than being "vague and amorphous"? *Id.* at 509.

The second exception comes into play only where Congress has "provid[ed] a comprehensive enforcement mechanism for protection of a federal right." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106 (1989). The existence of administrative protection will not itself foreclose private enforcement. "Rather, the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme." *Id.* at 107. That is the test generally applied in this Circuit. *See Barton*, 293 F.3d at 953.

In *Gonzaga University*, the Supreme Court clarified the standard that previously may have been confused by conflating its cases dealing with the question of whether a statute created an implied private right of action with those cases determining whether private rights enforceable under section 1983 were created. The Court held that "in either case we must first determine whether Congress intended to create a federal right." 536 U.S. at 283. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692, n.13 (1979)). The Court stated that the statute unambiguously must confer "rights," not merely "benefits." *Id.* at 283. Thus, the inquiry "simply require[s] a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 285.

1.

Applying the *Wilder* test as discussed in *Barton*, the Court finds that section 1396o creates a private right the plaintiffs may enforce through section 1983. First, it is clear that the statute was intended to benefit Medicaid recipients like the plaintiffs. The statute requires providers to serve

-21-

Medicaid recipients even if they have no money.  There is simply no way to interpret this statute as benefitting anyone other than Medicaid recipients.  *See* 42 U.S.C. § 1396o(e) (stating that "no provider participating under the State plan may deny care or services to an individual eligible for such care or services under the plan on account of such individual's inability to pay a deduction").  Second, the statute imposes binding obligations on the State.  "The State plan *shall* require that no provider participating under the State plan may deny care or services to an individual eligible for such care . . ." 42 U.S.C. § 1396o(e) (emphasis added).  Third, the right the plaintiffs are seeking is not too vague for courts to enforce.  They want Medicaid providers to be required to serve them when they cannot make their co-payments, even if they have previous co-payments remain unpaid.  Finally, the statute does not foreclose enforcement by the plaintiffs.  Section 1396o(e) creates a private right of action in these plaintiffs.

2.

The plaintiffs also contend in Count II of the amended complaint that private, enforceable rights are created by 42 C.F.R. § 435.905 to require the State to give Medicaid recipients notice of their rights regarding co-payments because that regulation effectuates their rights under 42 U.S.C. § 1396o(e).  The defendants contend that there is no statute in the Medicaid Act that confers such a right on the plaintiffs.

The regulation in question states:

(a) The agency must furnish the following information in written form, and orally as appropriate, to all applicants and to all other individuals who request it:
(1) The eligibility requirements.
(2) Available Medicaid services.
(3) The rights and responsibilities of applicants and recipients.
(b) The agency must publish in quantity and make available bulletins or pamphlets that explain the rules governing eligibility and appeals in simple and understandable terms.

-22-

42 C.F.R. § 435.905.

The plaintiffs rely on *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 906 (6th Cir. 2004), to support their argument that the regulation confers on them a right enforceable against the State under section 1983. In *Ability Center*, the plaintiffs sought to enforce a regulation enacted pursuant to the Americans with Disabilities Act that required public entities to comply with barrier-free design criteria on projects to alter public buildings commenced after a certain date. The court rejected the defendants' argument that the regulation did not confer a privately enforceable right, finding that the regulation "effectuates a mandate of Title II [of the ADA] and is therefore enforceable through the private cause of action available under the statute." *Id.* at 907. However, the court noted that "a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute." *Id.* at 906. The plaintiffs in that case were permitted to proceed because "Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide." *Id.* at 907.

A different result was reached in *Caswell v. City of Detroit Housing Commission*, 418 F.3d 615, 620 (6th Cir. 2005), where the plaintiff claimed the defendant housing commission violated a federal regulation related to section eight vouchers under the Housing Act of 1937 when it prematurely terminated assistance to him because he violated the terms of his lease with his landlord. Although the defendant apparently violated the terms of the applicable regulation, the court found that the statute Caswell cited prescribed only the manner of determining the amount of

-23-

rent subsidies, not the conditions under which they may be terminated. Citing *Gonzaga University*, the court stated that "in order for Caswell to bring a viable claim under § 1983, he must show that the right, of which he seeks vindication, is conferred by Congress in clear and unambiguous terms. Furthermore, the right conferred must be phrased in terms of the persons benefitted." *Id.* at 619. The court held:

> [The statute] establishes the *amount* of monthly assistance that a tenant should receive *if* he is a participant of the program. Here, Caswell claims that DHC improperly terminated his participation in the Voucher Program altogether, not that DHC violated the monthly assistance amounts set forth in the statute. Therefore, even if [the statute] conferred a right to a fixed amount of subsidies, the right Caswell claims to have been violated – under [the regulation] – has nothing to do with the amount of his subsidy. Moreover, we can find no provision under [the statute] which, in clear and unambiguous terms, confers a particular right upon the tenant to subsidies after the landlord initiates eviction proceedings. For example, [one statutory section] establishes certain obligations of the landlords of participants. However, nothing in this provision confers a right upon the tenant to continued housing subsidies during a court eviction proceeding. Because neither we nor Caswell can point to a specific statutory provision in the Housing Act that confers a right relevant to DHC's alleged violation of [the regulation], Caswell cannot pursue his claim under § 1983.

*Id.* at 620.

The plaintiffs contend in Count II of the amended complaint that publication 201 (which tells recipients that they "have the right to know if a co-payment is required" but fails to explain how to obtain that information) and publication 1111-15 (which tells recipients, "You may have a co-payment for some services. Your provider will tell you when you must pay the co-payment") are inadequate to comply with 42 C.F.R. § 435.905. Although that indeed may be the case, there is no provision of the Medicaid Act relevant to the violation of the regulation that is phrased in terms of a benefit to Medicaid recipients that confers a right "in clear and unambiguous terms" to require the State to publish and distribute that information. Section 1396o(e), upon which the plaintiffs rely,

-24-

is not phrased in terms of notice to eligible individuals, and it is by no means clear that the regulation, while sensible, "effectuates the mandate" of section 1396o(e). Therefore, the Court concludes that the plaintiffs may not base their section 1983 action on 42 C.F.R. § 435.905, and the defendants' motion seeking dismissal of Count II of the amended complaint must be granted.

## B.

The defendants further contend that even if the statutes and regulations cited by the plaintiffs create private rights, the State's policies and rules do not violate those statutes. The plaintiffs argue that 42 U.S.C. §§ 1396a(a)(14) and 1396o(e) and 42 C.F.R. §§ 447.15 and 447.53(e) clearly prohibit pharmacists from refusing services to Medicaid recipients who cannot make co-payments for prescriptions, regardless of whether the inability to pay occurs when the prescription is sought or arose when a previous prescription was filled without making the co-payment.

As noted earlier, the State's plan simply states: "Providers who elect not to provide services based on a history of bad debt, including unpaid co-payments, shall give beneficiaries appropriate verbal notice and a reasonable opportunity for payment." Compl. Ex. B. The State's Medicaid Provider Manual elaborates on this provision in the plan by making explicit that which the plan merely implies: "[T]he uncollected co-payment is considered a bad debt which allows the provider to refuse to provide future services according to Michigan's State Plan." Compl. Ex. E. The defendants argue that the plan does not violate federal law because the relevant statute is ambiguous on how to treat past-due co-payments, and its interpretation is reasonable and entitled to deference under the rule in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.* In *Chevron*, the Court stated that when a court evaluates a federal agency's interpretation of a statute found in implementing regulations, "if the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. 837, 842-43 (1984).

Congress was quite clear in allowing States to establish Medicaid plans that require participants to pay cost-sharing charges; but provisions of that nature are regulated and "may be imposed only as provided in section 1396o of this title." 42 U.S.C. § 1396a(14). Subsection (e) of section 1396o plainly states that the non-payment of cost sharing charges – such as co-payments – are not extinguished by the inability to pay, and the participant remains liable for them. However, the State is "require[d]" to include language in its plan that "no [participating] provider . . . may deny care or services to an individual eligible for such care or services under the plan on account of such individual's inability to pay a deduction, cost sharing, or similar charge." 42 U.S.C. § 1396o(e). The regulations repeat this injunction twice. *See* 42 C.F.R. § 447.15 (stating that "the provider may not deny services to any eligible individual on account of the individual's inability to pay the cost sharing amount imposed by the plan . . . . The previous sentence does not apply to an individual who is able to pay. An individual's inability to pay does not eliminate his or her liability for the cost sharing charge"); 42 C.F.R. § 447.53(e) (stating that "[n]o provider may deny services, to an individual who is eligible for the services, on account of the individual's inability to pay the cost sharing"). The message of these sections is clear: the State may allow providers to charge co-payments, and participants remain liable for unpaid co-payments; but withholding medical or prescription services from those without the ability to pay is not among the array of collection methods providers may use to collect these charges.

The Court does not find this language ambiguous. Nor does it believe that the passage of time can convert the withholding of medical or prescription services from an impermissible

-26-

collection method to a permissible one when a participant remains unable to pay the cost-sharing charge. No reasonable interpretation of the federal statutes and regulations allows for that construction. The State's plan provision that permits pharmacists to refuse to fill a prescription because a participant is unable to make a past-due co-payment amounts to the "den[ial] of care or services . . . on account of such individual's inability to pay a deduction, cost sharing, or similar charge." 42 U.S.C. § 1396o(e). This the statute prohibits.

The only other court to have addressed this identical issue was a Minnesota state court, which declared invalid similar language in Minnesota's Medicaid plan. *Dahl v. Goodno*, No. C9-04-7537 (2d Dist. Ct. Minn., Sept. 15, 2005). Minnesota's plan apparently served as a model to Michigan's plan, and it allowed pharmacists to deny services to Medicaid recipients who had unpaid co-payment debt. The *Dahl* court held that "adoption of Defendant's interpretation would require this Court to disregard the plain meaning of the federal statute." *Dahl* at 7. The state plan "directly conflicts with" the federal statute, "which clearly states that providers cannot deny services to a recipient on account of an inability to pay a co-pay." *Id.* at 8. The court granted summary judgment to the plaintiffs on this issue.

Other federal courts have found unlawful state Medicaid plan provisions that allowed providers to refuse services to participants unable to pay a cost-sharing charge, but those courts did not address the issue of past-due co-payments. *See Newton-Nations v. Rogers*, 316 F. Supp. 2d 883 (D. Az. 2004) (granting preliminary injunction); *Spry v. Thompson*, 2003 WL 23411996 (D. Or. 2003) (Magistrate Judge's Report and Recommendation), *adopted after de novo review*, 2004 WL 1050867 (D. Or. 2004) (holding that a demonstration project authorized by 42 U.S.C. § 1315 must include the prohibition against refusal of services stated in section 1396o(e)).

-27-

The defendants cite *Sweeney v. Bane*, 996 F.2d 1384 (2d Cir. 1993), in support of their position that the statute does not prevent the State from including the challenged language in its plan. In that case, the plaintiffs sought to enjoin an amendment to New York's Medicaid plan that allowed providers to charge co-payments for prescription drugs because they believed Medicaid recipients were not properly informed of their rights to receive services if they could not make the co-payment. The court found the notices were sufficient because they explained the situation in bold face type on the first page, and the New York Medicaid law included a provision requiring the state agency to "promulgate a regulation making it an unacceptable practice under the medical assistance program for a provider to deny services to an individual eligible for services based on the individual's inability to pay the co-pay amount." N.Y. Soc. Serv. Law § 367-a(6)(g)(I). It is the "unacceptable practice" that the defendants defend here. *Sweeney* provides no fortification for the defendants' argument.

The defendants also cite *Nebraska Pharm. Ass'n, Inc. v. Nebraska Dep't of Soc. Servs.*, 863 F. Supp. 1037 (D. Neb. 1994), in which Medicaid providers challenged the state system of reimbursing them for services provided to Medicaid recipients. However, the court specifically stated that "[t]his is not a case about whether Medicaid recipients ought to be required to make nominal copayments in order to receive Medicaid." *Nebraska Pharm. Ass'n* at 1041. In a footnote, the court noted that the state plan had a provision similar to the one being challenged here allowing pharmacists to refuse services to recipients with unpaid co-payments. The defendants believe the court's notice of this provision without negative comment means that the provision does not violate federal law. However, that provision was not at issue in that case, and none of the parties had reason to challenge it.

-28-

The defendants also argue that applying section 1396o(e)'s prohibition against withholding services because of unpaid co-payments, both current and past, would conflict with section 1396a(a)(23), known as the "provider choice" provision (which gives recipients the right to receive service from any provider "who undertakes to provide him such services"), and section 1396a(a)(30), known as the "equal access" provision (which requires states to implement a plan sufficiently remunerative that enough providers will sign up to provide services to Medicaid recipients). Those arguments are not persuasive. The provider choice provision, 42 U.S.C. § 1396(a)(23), gives recipients the right to seek services from anyone "who undertakes to provide him such services." That provision is not intended to give Medicaid providers the right to refuse patients for reasons specifically prohibited in the Medicaid Act. "42 U.S.C. § 1396(a)(23) gives recipients the right to choose among a range of qualified providers, without governmental interference." *Roberson v. Wood*, 500 F. Supp. 854, 862 (D.C. Ill. 1980). As with the Medicaid statute as a whole, section 1396a(a)(23) was intended to benefit Medicaid recipients. *Silver v. Baggiano*, 804 F.2d 1211, 1216-17 (11th Cir. 1986). "As for the right to obtain a needed medical service from a provider 'who undertakes to provide him such services,' 42 U.S.C. § 1396a(a)(23), the aim is to give the *recipient* a choice among available facilities." *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (emphasis added). Nor does 42 U.S.C. § 1396a(a)(30A), the equal access provision, collide with section 1396o(e). Although that provision was intended to benefit providers, there is nothing in section 1396o(e) that prohibits pharmacists from collecting co-payments from Medicaid participants by lawful means, including civil litigation. Nor does section 1396o(e) prohibit pharmacists from using self-help collection methods, such as withholding

products, to recover "bad debt" accumulated by extensions of credit for non-Medicaid services. Neither the provider choice nor equal access provisions conflict with section 1396o(e).

By a letter to the Court and statements at oral argument on the motions, the defendants have called the Court's attention to recent amendments to the Medicaid Act found in the Deficit Reduction Act of 2005, which are not effective yet. On February 1, 2006, the House of Representatives passed a version of that legislation. The Bill does not repeal § 1396o, but it does create new provisions that may impact it. The Bill provides:

> (a) In General. – Title XIX of the Social Security Act is amended by inserting after section 1916 the following new section:
> . . .
> "(2) COST SHARING. – Notwithstanding section 1916(e) or any other provision of law, a State may permit a provider participating under the State plan to require, as a condition for the provision of care, items, or services to an individual entitled to medical assistance under this title for such care, items, or services, the payment of any cost sharing authorized to be imposed under this section with respect to such care, items, or services. Nothing in this paragraph shall be construed as preventing a provider from reducing or waiving the application of such cost sharing on a case-by-case basis."
> . . .
> (c) Effective Date.-The amendments made by this section shall apply to cost sharing imposed for items and services furnished on or after March 31, 2006.

S. 1932, 109th Cong. § 6041 (2006). Because this new provision did not repeal section 1396o(e), there may be a need to reconcile the two statutes, an issue which neither party has briefed. Neither party has addressed the question of whether Congress intended to jettison the safety-net protection section 1396o(e) affords, and the Department of Health and Human Services has not issued regulations that interpret the legislation. The President has signed the Bill, but it is not presently effective, and the Court expresses no view of its impact on the issues presently before it. Moreover, the validity of the legislation has been called into question by reports that the version of the Bill passed by the House and signed by the President was different than the version passed by the Senate,

-30-

thereby contravening Article I, section 7, clause 2 of the Constitution. *Glitch Surfaces in Budget Measure*, Wash. Post, Feb. 9, 2006, at A07, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/02/08/AR2006020802172.html (last visited on Feb. 13, 2006) (on file with the Court). Because the parties have not briefed or formally argued the validity or effect of this new legislation, the Court will not consider it presently; the Court confines its opinion to the relevant statutes that are in effect now. If the parties believe the new legislation affects the Court's decision, they may seek relief by appropriate motion.

IV.

The plaintiffs seek an injunction against the defendants requiring them to change their plan terms to accord with section 1396o(e) and prohibit participating pharmacists from denying services to Medicaid recipients who are unable to pay cost-sharing charges, including past-due co-payments. Once the merits of the claims are determined, for a permanent injunction the moving party need show only (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998). Other factors are relevant as well, such as the probability that granting the injunction will substantially harm others, and whether the public interest will be served by the injunction. *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998).

The Court finds that the plaintiffs have demonstrated a continuing irreparable injury arising from the inability to fill prescriptions for life saving medications. As discussed in the previous section of this opinion addressing standing, the plaintiffs live below the poverty level, they have serious ailments that require medical therapy, and going without these vital medications can cause exacerbation of the conditions of disease and withdrawal symptoms.

The plaintiffs do not have an adequate remedy at law because they cannot sue the State or state officers for damages. The Eleventh Amendment bars the award of damages against these defendants in this federal action. *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991); *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).

The Michigan Pharmacists Association has filed a brief *amicus curiae* in which it argues that the injunction plaintiffs seek will harm its members. The Association contends that those of its members who operate in urban areas, and therefore have a high percentage of their clientele obtaining prescriptions through Medicaid, would be unfairly treated if they "must continually absorb the lost co-payment amounts from individuals who continue to, for whatever reason, refuse to pay the co-payments for their medications." Br. of *Amicus* at 5. The Association also threatens withdrawal from the Medicaid program by those members who cannot recover the $1 and $3 co-payments. These arguments, however, reflect neither the actual limitations of federal law nor the relief sought by the plaintiffs.

The safety-net provision in section 1396o(e) does not prevent pharmacists from collecting co-payments or extinguish a recipient's obligation for them. It merely prevents pharmacists from using the threat of withholding medication from those who cannot pay as a collection device. In its brief, the Association acknowledges the "reasonable requirement . . . that low income individuals who are in immediate need of prescription drugs should not be prevented from obtaining prescription drugs because of a present inability to meet a co-payment amount." Br. of *Amicus* at 4-5. It is unclear to the Court how that requirement becomes unreasonable when the "present inability" to pay relates to a co-payment previously charged but not collected. If pharmacists desire

to collect these past-due co-payments they have all the remedies the law provides to creditors. Moreover, the recipient's nonpayment of a cost-sharing charge cannot arise "for whatever reason"; it must be due to an inability to pay.  The State may enact rules to assist pharmacists in determining when an individual cannot afford a co-payment.   Given the Association's arguments and acknowledgments in its *amicus* brief, the Court finds it unlikely that preventing pharmacists from using a single self-help tool for collecting co-payments will result in substantial harm to the providers.

Finally, the Court finds that the public interest is served by ensuring that poor people in need of medication receive it in a timely fashion.  Timely receipt of palliative medication can obviate the need for more costly treatment later and help prevent the spread of contagious disease.  Ensuring compliance with Congress' requirements for federal benefits programs also is in the public interest.

V.

The Court finds that plaintiffs Beeker, Baliko, and Charles Lewis have standing to bring this action, but plaintiff Henry Lewis does not.  In addition, 42 U.S.C. § 1396o(e) confers rights upon the plaintiffs that are enforceable through 42 U.S.C. § 1983.  However, 42 C.F.R. § 435.905 does not confer such a right.  There are no material facts in dispute, and the State's Medicaid plan provision allowing pharmacists to withhold services on account of "bad debt" consisting past-due co-payments from Medicaid recipients who cannot afford them violates federal law.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss or for summary judgment [dkt #48] is **GRANTED IN PART AND DENIED IN PART**, and Count 2 of the amended complaint is dismissed.

-33-

It is further **ORDERED** that the plaintiffs' motion for summary judgment [dkt #37] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the defendants are **RESTRAINED AND ENJOINED** from implementing, promulgating, and enforcing a provision of its Medicaid plan that permits or allows a pharmacist to withhold services on account of "bad debt" consisting of past-due co-payments from Medicaid recipients who cannot afford them. The defendants shall take immediate steps to notify participating pharmacists that they may not withhold services for such reasons, and the defendants shall modify the State's Medicaid Provider Manual accordingly.

Because no greater relief than the present injunction could be afforded the plaintiffs' prospective class, it is further **ORDERED** that the plaintiffs' motion to certify the action as a class action [dkt #38] is **DENIED** as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 13, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 13, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---